LETHEA KING,

                    Plaintiff,                        OPINION AND ORDER

    v.

                                            16-cv-375-wmc

IGOR STEINBERG, SUSAN SCHNEIDER
and BONNIE CYGANEK,

                    Defendants.

Plaintiff Lethea King, a former project manager for the Bureau of Computing Services ("BCS") within the Wisconsin Department of Justice ("DOJ"), has sued her former superiors, defendants Susan Schneider, Igor Steinberg and Bonnie Cyganek, alleging that they discriminated against her based on race, created a hostile work environment, and retaliated against her in violation of the Equal Protection Clause and 28 U.S.C. § 1983.[1]  Pending before the court is defendants' motion for summary judgment on all claims (dkt. #16), which the court will now grant because plaintiff has failed to meet her burden to produce sufficient evidence to establish her claims.

## UNDISPUTED FACTS[2]

### A. Background

King, an African American woman, was hired by the Wisconsin DOJ's BCS as a

---

[1] Initially, plaintiff had named other former colleagues (Alli Jerger, Tiffany Hampton, David Tolmie and Elizabeth Behnke) as defendants and alleged claims under Title VII and Wis. Stat. § 895.46, however following an unopposed motion to dismiss (*see* dkt. ##6, 13), those defendants and claims were dismissed (dkt. #14).  (*See* Defs.' Summ. J. Br. (dkt. #25) 4-5 (describing procedural posture and remaining claims).)

[2] Viewing the facts in the light most favorable to plaintiff as the non-moving party, the following facts are material and undisputed for purposes of summary judgment, except where noted.  At the

project manager in October 2012.  King is a certified project management professional with degrees as a Cobol Programmer, as well as technical and project management experience at American Family Insurance.  DOJ hired King to implement project management methodology.

King's first performance evaluation was completed by her initial supervisor, David Wolfe, in January 2013; her second was completed by defendant Bonnie Cyganek in April 2013.  King was provided copies of these evaluations and had the opportunity to review each with the evaluator.[3]

---

outset, the court notes that in response to many of defendants' proposed findings of fact, plaintiff responded simply that she "lacks the information necessary to admit the information in this PFOF, and she therefore disputes [the] same."  (*See e.g.*, Defs.' Reply to Pl.'s Resp. PFOF (dkt. #36) ¶¶ 5-9.)  Unless otherwise noted, defendants' proposed findings of fact that are responded to in this manner are accepted as true, as plaintiff has put forward no evidence to create a genuine dispute of fact.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . consider the fact undisputed for purposes of the motion[.]"); *see also* Pretrial Conference Order (dkt. #12) 14 ("Unless the responding party puts into dispute a fact proposed by the moving party, the court will conclude that the fact is undisputed.").  This is particularly appropriate here since many of the proposed facts that plaintiff answered in this manner should have been within her knowledge, while others could have been the subject of discovery.  *See also* Fed. R. Civ. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.").  In any event, pleading a "lack[] of information" falls short of a nonmovant's burden to establish the existence of a genuine dispute of material fact.

[3] In their briefs, the parties disagree about a document that the defendants initially identified as King's first performance evaluation.  (Pl.'s Opp'n (dkt. #32) 6-8; Disputed April 2013 Performance Evaluation (dkt. #23-15) 1-2; *see also* Defs.' Reply to Pl.'s Resp. PFOF (dkt. #36) ¶ 17.)  Yet defendants do not dispute plaintiff's statements in her proposed finding of fact ¶ 11 that she had never seen that document before; it was not her performance evaluation; and her first performance evaluation was in fact completed by Wolfe in January instead of in April 2013.  Nevertheless, defendants represent that the document had been located in Wolfe's computer file, making it a business record.  (Defs.' Reply to Pl.'s Resp. PFOF (dkt. #36) ¶ 17.)  Because of the disputed nature of this document, the court has not considered its contents for purposes of deciding this motion.

Cyganek served as the Administrator for the DOJ's Division of Management Services ("DMS") beginning in March 2012. She was appointed by the state attorney general to oversee the operations of the Bureau of Budget and Finance and the BCS Bureau of Human Resources. Cyganek did not, however, supervise King's daily activities. Instead, Wolfe initially acted as King's direct supervisor, a responsibility assumed by defendant Susan Schneider when she became the Deputy IT Director for the DOJ on September 30, 2013, to manage and oversee BCS generally. In turn, defendant Igor Steinberg was Schneider's immediate supervisor and the Director of BCS.

When Steinberg began working for the DOJ in August 2013, he met with BCS staff to introduce himself and outline his expectations. Among other expectations, he told BCS staff that they needed to own and be accountable for their work, to admit mistakes, to solve problems collaboratively, to trust their colleagues and to be team players.

## B. Employment Issues

DOJ personnel complaint investigations generally mark the beginning of any disciplinary action and involve at least one supervisor and one human resources professional. These investigations look into formal complaints received by supervisors or human resources. During the investigation, the employee accused of violating work rules receives a notice of the investigation, which would tell the employee to participate in an investigatory interview. Nevertheless, the parties devote a lot of their submissions to detailing criticisms of King that did not result in disciplinary action, so the discussion of King's employment issues will begin with those matters before turning to more formal disciplinary actions.

3

### 1. Non-Disciplinary Actions

#### a) General complaints and alleged inappropriate tone

Defendants assert that over the course of 2013, King's first full year of employment by DOJ, DMS Administrator Cyganek heard that King was hard to work with, although no formal complaints had been made. For example, former defendant BCS project manager Dave Tolmie avers that in the summer of 2013, King berated a co-worker named Yanbing, giving him the impression that King "had verbally destroyed [Yanbing]." (Tolmie Decl. (dkt. #18) ¶ 6.) Plaintiff denies "berating" or "verbally destroying" anyone.

On August 6, 2013, King emailed the director of special operations, Jody Wormet, in an attempt to schedule a meeting. After Wormet replied that he was unavailable at the time King selected, she asked him to "ensure that [his] calendar is up to date -- as it showed you as being available." King went on to obverse, "For this project to succeed we will need to meet and it will be difficult to do so, if I'm scheduling meetings for when you are here and in essence you aren't." (Aug. 6, 2013 Email (dkt. #22-2) 1.) Wormet forwarded a different email from King, asserting that his "schedule is up to date," and continuing "I don't know what she is talking about and I am getting irritated with her tone and persistence on the issue." (*Id.* at 3.)

Defendants further contend that defendant Schneider, as Director of IT and King's direct report, personally became aware of complaints about her behavior from BCS employee Tom Gries during a transition meeting in October 2013. Gries reportedly told Schneider that "it's not working, she has taken on authority, she doesn't seek to understand, doesn't take criticism well, alienates people and he didn't like her style."

(Schneider Decl. (dkt. #23) ¶ 6.)  On November 26, 2013, King then emailed a colleague with a copy to Schneider, stating

> What concerns me right now is this, I don't understand why you are just now alerting me to this as you have had the disk in your possession since November 4th or thereabouts. When you provide dates and duration for completing a task in the plan, that means you will provide your deliverable on that date. You[r] inquiry below lets me know that those agreed upon dates were never achievable. Please know that from a project management perspective that is unacceptable.

(Nov. 26, 2013 Email (dkt. #23-1) 1.)  Defendants assert that Schneider was concerned about King's tone in this email, while plaintiff argues there was nothing inappropriate about her tone.

In December 2013, defendants also aver that Schneider spoke with other project managers, Tolmie and Hampton, about King, and they, too, complained about working and interacting with King.  Plaintiff denies this as well.[4]  On December 16, 2013, however, Tolmie forwarded an extensive email chain between himself, King, Hampton and others to Schneider.  In response to a suggested meeting, the parties agree that plaintiff advised

---

[4] Specifically, in plaintiff's response, she states:  "A consistent pattern is allegations like those made in this PFOF but not supported by any actual facts or examples.  There is no description of how she was 'brutal' or abused an employee[] or what the 'personal attacks' on Tolmie consisted of. These allegations have consistently been unsupported conclusions with no examples provided." (Defs.' Reply to Pl.'s Resp. PFOF (dkt. #36) ¶ 35.)  This is one of many examples where the parties profoundly disagree about how to characterize King's management style.  (*See also id.* ¶ 41("Despite her repeated request for details regarding what she had done wrong, Defendants refused to provide her with any specifics.  They would simply insist that she had been abusive and unprofessional . . . . We now know that they continue to fail to be able to provide any such details, and she still disagrees that she was abusive or inappropriate toward her co-workers at any time."); *id.* ¶ 79 ("King finds it remarkable that when she is the one making a complaint, her claims appear to have been summarily dismissed.  When other[s] complain about her, their word is accepted as truth even when it is contradicted not only by King, but by others.").)

everyone that she had "nothing to discuss," and that she was "not sure why this is becoming such a big deal. . . . I'm just amazed at the amount of time this one thing has consumed, when in the big scheme of things it's not that big of a deal." (Dec. 16, 2013 Email (dkt. #23-4) 1.) According to Schneider, this email exchange reinforced concerns identified by Tolmie and Hampton.

On March 26, 2014, King emailed another DOJ employee and a Department of Administration ("DOA") employee with a question. When the DOA employee responded, she addressed her email to Karen VanSchoonhoven, the DOJ employee, who King had included in the "To" field of her email. King then responded "I was the originator of the email below, therefore it is unclear to me -- why your response was to Karen. . . . In the interim, please let **me** know what else may be required." (Mar. 26, 2014 Email (dkt. #22-6) 1-2 (emphasis in original).)

### b) Amber Alert project

As the project manager for the Amber Alert project, King drafted the project plan, with input from team members. She was also responsible for ensuring that the software testing was completed before providing it to the client. The plan specified January 23, 2014, as the target date for a meeting with Dane County 911 operators. During this meeting, program bugs were discovered, leading King in February to ask Dane County 911 to reschedule the meeting. In response, Dane County 911's contact said he was waiting to hear from the liaison to "make sure everyone is on the same page before [he] pull[ed his] entire team together again for this." (Feb. 26, 2014 Email (dkt. #22-5) 4.) In response, King expressed uncertainty as to why she would need to check with the DOJ liaison since

King only "needed the developers to fix the issues that were found, which they have." (*Id.* at 3-4.)

On February 20, 2014, Schneider reports learning of concerns about the Amber Alert website project, as well as King's role in it. Specifically, concerns were again raised that King was abrupt, rude, and resistant to creating a poster for consistent layout, and she did not view the Division of Criminal Investigation ("DCI") as the customer. To combat some of these concerns, Schneider added Alli Jerger, a business analyst for DCI, to the team.

After a meeting on March 10, 2014, Jerger informed Schneider that DCI felt like it was not receiving enough support from BCS, that BCS was unwilling to listen to DCI's needs, and that BCS seemed to care more about deadlines than DCI's requirements. (Mar. 11, 2014 Email (dkt. #23-6) 1.) Jerger also complained that King had scheduled a training with Dane County 911 without first showing the product to DCI, resulting in a waste of Dane County 911's time and money, and that DCI had never before "had such an adversarial relationship in a project." (*Id.*)

### c) GeneMapper project

Following the completion of the GeneMapper project, King emailed Schneider a document titled "GeneMapper Lessons Learned Summary" on May 1, 2014. The parties agree that King informed Schneider that she relied on the feedback provided and had not cherry-picked. (Defs.' Resp. Pl.'s PFOF (dkt. #35) ¶ 7.) Still, Schneider was "surprised and disappointed [that the summary contained] no reference to the team effort involved in making this project a success," while addressing King's input a number of times. (May

1, 2014 Email (dkt. #23-7) 1, 4-5.)  Schneider claims her reaction was due in part to the fact that in March, King and others received an email from William Peterson, who was part of the project team, complementing the work of BCS on the GeneMapper project (May 1, 2014 Email (dkt. #22-8) 2), although the parties disagree whether that email was submitted as part of the "Lessons Learned" process.  The parties do agree that the team did very good work on this project, while plaintiff disagrees that she "should have included the accolades to her team members" in the Lessons Learned document, asserting that those comments were not included in the source material for Lessons Learned.  (*See* Defs.' Reply to Pl.'s Resp. PFOF (dkt. #36) ¶ 62.)

### d)  Pricing document: Oracle License

Also in May 2014, King emailed a concept document to Steinberg; this document related to an Oracle license pricing recommendation and was intended to detail options and costs.  Typically they are received by non-technical decision-makers and so they must be written with this audience in mind.  This concept document was created by King and Mark Martalock, the project's technical computer developer.  Upon reading the proposal, Steinberg was concerned about the technical nature of the writing and he asked King to take an English class.  Plaintiff does not dispute this occurrence, but alleges that the motivation was "to humiliate" and was an "attempt to force [her] to become so frustrated that [she] would leave [her] position."  (*Id.* ¶ 65.)  Plaintiff also asserts that the draft was written by Martalock, who defendants did not direct to take an English class.  Defendants object that King has not shown that she knew what was required of Martalock.  (*See* Defs.' Resp. Pl.'s PFOF (dkt. #35) ¶ 10.)

8

### e) June 2014 performance evaluation

In June 2014, Schneider completed King's annual performance evaluation, which specifically noted that she needed to improve in document drafting, team building and customer relations. (*See* June 2014 Evaluation (dkt. #23-8) 1-3.) Plaintiff refused to sign this evaluation and provided a rebuttal asserting that the evaluation was based on "inaccurate" information, although at that point she did not articulate a belief that she was being targeted based on her race. (*Id.* at 5.)

## 2. Disciplinary Actions

### a) December 2013 disciplinary investigation

As early as December 2013, DOJ's DMS Administrator Cyganek became aware of complaints about King's lack of professionalism, prompting her to open a formal investigation. Deputy IT Director Schneider and HR director Mary Casey then conducted interviews and reviewed documents, including interviewing King on December 19, 2013. At that time, Schneider claims that King "stated she was completely surprised by the things her colleagues had said, took no responsibility for her unprofessional contacts, deflected blame on others, and showed no remorse that things she said, justified or not, hurt her colleagues' feelings." (Schneider Decl. (dkt. #23) ¶ 11.) While plaintiff purports to dispute this characterization, she acknowledges disagreeing with the information provided to her, complains that defendants Schneider and Casey "simply insisted that [she] had been abusive and unprofessional," and criticizes them for declining to provide her with specific details. (King Decl. (dkt. #33) ¶ 10.) Based on the investigation, Schneider believed King violated work rules governing employee behavior, but ultimately no

discipline was issued. Defendants allege that this was because Administrator Cyganek believed that counseling King would be better than disciplining her. The parties agree that there was a delay in King being informed of this final conclusion.

      **b)**      **July 2014 disciplinary investigation involving interactions with Elizabeth Behnke**

The second formal investigation began with Elizabeth Behnke, a procurement specialist at the DOJ, who complained that King had acted unprofessionally towards her. More specifically, Behnke complained that King was adversarial, questioned her, undercut her and mistrusted her. Plaintiff denies these allegations, again criticizing defendants for not providing "a single example." (Defs.' Reply to Pl.'s Resp. PFOF (dkt. #36) ¶ 70.) During the resulting investigation, another DOJ employee, Kevin Jones, was interviewed and he reported overhearing a conversation between King and Behnke, in which King had been aggressive, overbearing and implied that Behnke was not doing her job. This prompted Jones to encourage Behnke to talk to her supervisor about King's treatment of her. King also denies these allegations, again criticizing defendants for not providing specific details.

Regardless, the parties agree that Behnke's complaint resulted in King, her attorney, Schneider and a representative from human resources attending an investigatory meeting on July 17, 2014.[5] The parties also agree that King was provided less than eight hours'

---

[5] The day before this investigatory meeting, on July 16, 2014, King reported that Behnke had failed to inform her of an important meeting and had been rude to her. Schneider informed King a few days later that she had spoken with the Director of Budget and Finance and that the concerns had been addressed. (*See* July 18, 2014 Email (dkt. #23-14) 1-2.)

notice before this meeting and that King expressed her belief at the meeting that she communicated positively with others. While defendants criticize King for failing to take responsibility at that meeting, King avers that she was simply denying behaving inappropriately. During the investigation, Schneider also spoke to other employees who complimented the work of both Behnke and King, but added that King was impatient.

By this point, defendants assert that Schneider had been receiving complaints for months about King being demeaning and unprofessional. Schneider had also reviewed some of King's emails and concluded that King had used an unprofessional tone. Finally, Schneider claims that she found the testimony of Jones, a disinterested witness, convincing. As a result, Schneider decided to issue discipline. Administrator Cyganek claims that she reviewed the investigation and agreed with investigators Schneider and Casey's recommendation to do so. As a result, King received a one-day suspension.

### c) August 2014 investigation and resignation

At the start of August, DCI's Business Analyst Jerger, who Schneider had assigned to the Amber Alert project team specifically to ameliorate King's communication issues with DCI, complained to Schneider that: King had been rude to her at a meeting; King failed to work with her on scheduling meetings; and King was pushing an aggressive timeline with which her customer DCI uncomfortable, such that the clients had reached out to Jerger.[6] Jerger also told Schneider that in June 2014, King had invited her to a meeting with a vendor about a "Time Matters" program, but then had been unprofessional

---

[6] The court assumes that the clients refer to employees at DCI, but the record is unclear as to who was speaking with Jerger.

at the meeting itself.  In particular, Jerger reported that King belittled her in front of the vendor by failing to introduce her and dismissing her questions.  King denies belittling Jerger.  Jerger further represents that she witnessed King acting dismissively and rudely towards Behnke and Tolmie as well.[7]

Schneider and human resources investigated this complaint.  When King received the investigation notice, she said to Schneider, "You really enjoy this don't you, who is it this time?"  (Defs.' Reply Pl.'s Resp. PFOF (dkt. #36) ¶ 84.)  King acknowledges asking this question, but explains it was prompted by her belief she was being retaliated against and harassed.  (*Id.*)  Schneider responded, "No, I don't, this pattern of behavior needs to stop."  At that time, Schneider declined to tell King who the complainant was, saying they would discuss it during the investigatory meeting.  (*Id.*)

King received a pre-disciplinary notice on August 27, 2014, following the investigation.  She resigned that same day.  Plaintiff claims she resigned to protect her health and well-being, unable to take the stress and harassment any longer.  King also claims that she had no other choice.  (*See* Resignation Letter (dkt. #20-6) 1.)

### C. Post-Resignation Grievance & Hostile Work Environment Investigation

Following her resignation, King filed a grievance over her original one-day suspension, seeking reversal and reimbursement for lost salary.  A grievance hearing was initially scheduled for November 14, 2014, but King was unable to attend.  Regardless,

---

[7] From defendants' proposed findings of fact, Jerger appears to have made all of these complaints at the beginning of August 2014.  (*See* Defs.' Reply Pl.'s Resp. PFOF (dkt. #36) ¶¶ 80-82.)

plaintiff was reimbursed for the lost salary.[8]

During the summer of 2014, Cyganek asked the Director of Special Investigations for DCI to work with the human resources director to investigate King's claim that she had been harassed and subjected to a hostile work environment. The investigation resulted in a written report concluding that King had been subject to neither:

> While it is clear Ms. King perceives her work environment to be very unpleasant and she provided clear examples of her experiences to support her perception, the examples constitute a difference of opinions and expectations between a supervisor and an employee. No information gathered during the course of the investigation indicated that any activity was "designed to threaten, intimidate or coerce."

(King Hostile Work Environment Complaint Summary (dkt. #21-1) 2.)

## OPINION

Plaintiff asserts equal protection claims of race discrimination, hostile work environment and retaliation. Defendants move for summary judgment on the basis that she has no evidence of race discrimination, and even if she did, she could not show that that defendants' reason for disciplining her was pretextual. Summary judgment is appropriate where the moving party establishes "that there is no genuine dispute as to any material fact," and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A nonmoving party with the burden of proof cannot "merely allege the existence of a factual dispute to defeat summary judgment," rather "[s]he must supply evidence to allow a jury

---

[8] Although not material to the dispute, defendants maintain this reimbursement of salary was prompted by Cyganek's "want[ing] to bring closure to the complaint," while plaintiff speculates that "the salary was returned because the goal of forcing King to resign her position had been accomplished and there was therefore no longer any reason to continue to harass her." (*Id.* ¶ 89.)

to render a verdict in her favor." *McPhaul v. Bd. of Com'rs of Madison Cty.*, 226 F.3d 558, 563 (7th Cir. 2000) (internal citations omitted) (finding plaintiff had failed to establish a prima facie case because she had failed to offer evidence suggesting discrimination because of her race), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013). As the Seventh Circuit has succinctly and repeatedly explained, "summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal citation and quotation marks omitted). For the reasons explained below, plaintiff King has failed to put up sufficient evidence to support her claims against the named defendants.

## I. Race Discrimination Claim

As for plaintiff's principal claim of race discrimination, defendants seek summary judgment for failure to marshal "sufficient evidence to support a jury verdict of intentional discrimination" because of her race. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).[9] Historically, this was done through something called direct or indirect proof, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1975) (articulating burden-shifting framework sometimes referred to as the "indirect" method of proving employment discrimination), but "instead of separating evidence under different methods of proof," the Seventh Circuit recently affirmed that '[e]vidence must be considered as a

---

[9] The Seventh Circuit has also held that "the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection." *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003).

whole, rather than asking whether any particular piece of evidence proves the case by itself -- or whether just the "'direct'" evidence does so or the "'indirect'" evidence.'" *Golla v. Office of the Chief Judge of Cook Cty.*, No. 15-2524, 2017 WL 5476342, at *3 (7th Cir. Nov. 15, 2017) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)) (affirming summary judgment on reverse race discrimination claim where plaintiff only put forward evidence that he was white and his better-paid colleague was African American).

Still, the *McDonnell Douglas* framework remains useful. *Ortiz,* 834 F.3d at 766. In response to defendants' summary judgment motion, plaintiff, alleges that her "claims are supported by both direct and indirect proof." (Pl.'s Opp'n (dkt. #32) 2.) In fact, plaintiff has failed to put forward sufficient evidence under any method -- whether the prevailing "convincing mosaic" or direct/indirect proof -- to defeat defendants' motion.

To establish a prima facie case of an equal protection violation under the *McDonnell Douglas* framework, plaintiff must show that: "(1) [s]he is a member of a protected class, (2) [s]he is similarly situated to members of the unprotected class, (3) [s]he suffered an adverse employment action, and (4) [s]he was treated differently from members of the [un]protected class." *Williams*, 342 F.3d at 788. Proof of these four factors would ordinarily be sufficient for plaintiff to make a prima facie showing that "defendants treated her differently from others who were similarly situated," and that this differential treatment was "because of her membership in the class to which she belonged." *Hedrich v. Bd. of Regents of the Univ. of Wis. Sys.*, 274 F.3d 1174, 1183 (7th Cir. 2001). Having made this showing, the burden shifts to the defendants to put forward a nondiscriminatory, legitimate reason for their actions. *Williams*, 342 F.3d. at 788. Finally, if the defendants

have met this burden, plaintiff must demonstrate that the reasons offered were pretextual. *Id.*

Because plaintiff has failed to establish a prima facie case, however, the court need not proceed past this initial test.  As an African American, the parties agree that King is a member of a protected class.  They also agree that her one-day suspension *could* be deemed an adverse employment action.[10]

However, defendants argue persuasively that the other actions about which plaintiff complains do not constitute adverse employment actions, therefore, that she was not constructively discharged.  "An adverse employment action must be materially adverse"; it must "significantly alter[] the terms and conditions of the employee's job." *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (internal citations omitted) (affirming grant of summary judgment in age discrimination suit because plaintiff had "suffered no materially adverse employment action").  "'[N]ot everything that makes an employee unhappy is an actionable adverse action.'" *Oest v. Ill. Dept. of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)) (concluding negative performance evaluations, and oral and written reprimands alone were not actionable adverse employment actions), *overruled on other grounds by Ortiz*, 834 F.3d at 765. In particular, comments and general hostility are not actionable unless they are "severe and pervasive." *Griffin*, 356 F.3d at 829.  Further, "unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse

---

[10] As noted above, following King's resignation, she was reimbursed for the pay she lost during her suspension, but that the discipline itself would still be reflected in her personnel file.

employment actions." *See Grube v. Lau Inds., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) (internal citations omitted) (affirming summary judgment in sex discrimination suit because plaintiff had not suffered an adverse employment action and could not establish constructive discharge).

As a result, the non-suspension employment actions that plaintiff complains about likely are not adverse employment actions. For example, the 2013 investigation that resulted in no discipline, as well as the 2014 investigation preceding her resignation, were not adverse employment actions. Likewise the criticisms from Schneider and Steinberg -- including those put in her performance evaluation, the criticism regarding the Lessons Learned document, and the recommendation that she take an English class -- were also not adverse employment actions. While plaintiff understandably did not appreciate these events, they did not "significantly alter" the conditions and terms of her employment. Nor could a reasonable jury find King was constructively discharged because of her race. *See Griffin*, 356 F.3d at 830 (explaining that action already found not to be an actionable adverse employment action could not be the basis of a constructive discharge).

The court, however, need not decide whether plaintiff satisfied this prong, because she fails to put forth evidence that she was treated differently because her race. Certainly, plaintiff offers *no* direct evidence of racial animus. *Hutt v. Abbvie Prods. LLC*, 757 F.3d 687, 691 (7th Cir. 2014) ("Direct evidence requires an admission of discriminatory intent, i.e., 'smoking gun' evidence." (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014)). Similarly, under the indirect method, plaintiff fails to establish that she was treated differently than similarly-situated members of an unprotected class. To establish

that a colleague is an appropriate comparator, a plaintiff must establish she is "similarly situated" by showing the proposed comparator "(1) dealt with the same supervisor, (2) w[as] subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him]." *Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014) (alteration in original) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (internal quotation marks omitted)). Here, defendants detail why Behnke and Martalock are not appropriate comparators. (Summ. J. Br. (dkt. #25) 17-18 (explaining that Behnke reported to a different supervisor and Martalock had a different job title, with different responsibilities).) In response, plaintiff simply argues unpersuasively that "Defendants attempt to define [similarly situated employees] in such a way to render the remedy non-existent" and that plaintiff "was subjected to unreasonable, unwarranted and harassing disciplinary actions by her supervisors for engaging in conduct that would not have resulted in such a response if engaged in by *any* other employee." (Pl.'s Opp'n (dkt. #32) 3.) Ultimately, plaintiff does not identify any suitable comparators. Therefore, she has not shown that she was similarly situated to employees outside her protected class, nor that she was treated differently because of her race. This alone is fatal to her prima facie case.

Looking more broadly for the "convincing mosaic," plaintiff fails to provide *any* evidence of racial animus.[11] At least alone, allegations that colleagues who complained

---

[11] In the equal protection context, some cases require a fifth element to establish a prima facie case under the *McDonnell Douglas* framework -- that the defendant acted with discriminatory intent. However, the Seventh Circuit considers requiring such proof separately to be "redundan[t]." *Williams*, 342 F.3d at 788. The court here considers discriminatory intent not as an element of the indirect method, but rather as part of proof of a convincing mosaic.

about her and investigated those complaints were Caucasian, while plaintiff is African American (Compl. (dkt. #1) ¶ 462), are not evidence of racial animus. *See Golla*, 2017 WL 5476342 at *3 ("Golla presented no evidence, beyond the fact that he is white and Taylor is African-American, to demonstrate that race contributed to disparity in their pay."). Likewise, her unsupported allegation that "the testimony of Caucasian defendants in all matters was immediately accepted as accurate, while Ms. King's testimony was dismissed outright" (*id.* ¶ 465) fails to establish racial animus. Argument that "we know all too well that a direct comment or statement . . . may often be perceived as aggressive coming from a woman or a black employee," and unsupported assertions that "approximately sixteen employees of color either resigned or were dismissed from their positions at DOJ in recent years" are also insufficient.[12] (Pl.'s Opp'n (dkt. #32) at 3-4.)

Finally, plaintiff spends the majority of her opposition arguing that: (1) her actions fell within the bounds of professionalism and defendants' decisions and actions concerning her were improper; and (2) her "offenses" were slight and are the best evidence of race discrimination. She also quotes her own cherry-picked emails, which she claims are more representative of her email correspondence.[13] This also is not enough to meet her burden

---

[12] Aside from the latter assertion having little force out of context, defendants correctly point out that plaintiff provided no evidence to support the allegation. Assuming plaintiff had provided evidence supporting this assertion, plaintiff's argument that "this exodus" could not "be simple coincidence" would still fall flat without any evidence that the employees of color left at a higher rate than their white colleagues.

[13] Plaintiff criticizes defendants for "rely[ing] on a handful of examples, none of which effectively make their case, to make broad and negative claims about King such that she 'had a terrible time getting along with her colleagues and clients.'" (Pl.'s Opp'n (dkt. #32) 9.) However, defendant's reliance on the Lessons Learned emails is rooted in plaintiff's complaint. (*See* Compl. (dkt. #1) ¶ 419.)

in opposing summary judgment. The Seventh Circuit has noted that "'[a]n employee's self-serving statements about his ability . . . are insufficient to contradict an employer's negative assessment of that ability,'" with the clarification that "it is the absence of personal knowledge or the failure to set forth 'specific facts' as required by Rule 56(e) of the Federal Rules of Civil Procedure that is problematic," rather than the "mere self-serving nature of a nonmovant's affidavit." *Williams*, 342 F.3d at 790 (quoting *Gustovich v. AT&T Commn'cs, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992)). Here, defendants offer sworn declarations of plaintiff's coworkers and supervisors, supported by contemporaneous complaints that plaintiff was difficult to work with and unreceptive to constructive criticism.

Based on this record, drawing all reasonable inferences in plaintiff's favor, a reasonable jury would have to engage in rank speculation to conclude that King was discriminated against because of her race.

## II. Hostile Work Environment Claim

A plaintiff must establish four elements to avoid summary judgment on a hostile work environment claim: "(1) the work environment must have been both subjectively and objectively offensive; (2) her [race] must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability." *Orton-Bell*, 759 F.3d at 773 (quoting *Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014)).[14] Since plaintiff cannot establish any of these elements, the court will also grant summary judgment on her hostile work environment claim.

---

[14] As with race discrimination claims, the Title VII standard applies to equal protection claims for hostile work environment. *See McPhaul*, 226 F.3d at 566 n.6.

In her opposition brief, plaintiff argues that defendants' "harassing behavior . . . eventually created such a hostile work environment . . . that she had no choice but to resign." (Pl.'s Opp'n (dkt. #32) 3; *see also id.* at 15 (arguing the suspension, criticism, and discipline "resulted in the creation of such an untenable and hostile workplace environment that King could no longer stand to remain at DOJ").) Plaintiff also creates a strawman by misreading defendants' argument that she cannot successfully prove constructive discharge, then asserting that neither she nor "any other employee is or should be required to continue to be [subjected] to the treatment that she was enduring because her colleagues had yet to hang a noose in her office." (*Id.* at 16-17.)

As defendant points out, plaintiff was investigated for possible workplace violations *three* times between December 2013 and August 2014, yet received only a one-day suspension. Even combined with the criticisms of her professionalism and behavior, a reasonable person would not find this to be objectively unreasonable, nor severe/pervasive. Plus, unlike other hostile work environment claims that have been allowed to proceed past summary judgment, there is *no* evidence that defendants' actions were racially motivated. *Compare Orton-Bell*, 759 F.3d at 775-76 (reversing summary judgment on hostile work environment claim based on evidence of a "constant barrage of sexually charged comments . . . clearly pervasive, offensive, and based on [plaintiff's] sex," such that there was "enough evidence for a jury to find that it was severe, subjectively offensive"); *with Yuknis v. First Student, Inc.*, 481 F.3d 552, 553 (7th Cir. 2007) (explaining that a plaintiff cannot establish a hostile work environment claim where "'the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been

discriminated against on the basis of her sex.'" (quoting *Galloway v. General Motors Service Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996))).

## III. Retaliation Claim

Finally, in Title VII jurisprudence, a plaintiff can prevail on her claim of retaliation if she proves that she: "(1) opposed an unlawful employment practice under Title VII; (2) was the object of an adverse employment action; and (3) the adverse employment action was caused by her opposition to the unlawful employment practice." *Congleton v. Oneida Cty.*, No. 16-cv-412-wmc, 2017 WL 4621117, at *16 (W.D. Wis. Oct. 13, 2017) (citing *Cullom v. Brown*, 209 F.3d 1035, 1040 (7th Cir. 2000)). However, unlike the plaintiff's other asserted causes of action which rely on Title VII's standards, there is no retaliation claim under the Equal Protection Clause. *See id.* at *17-*18 (citing *Tate v. Ancell*, 551 Fed. Appx. 877, 898 (7th Cir. 2014); *Boyd v. Ill. State Police*, 384 F.3d 888, 898 (7th Cir. 2004); *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1296 n.8 (7th Cir. 1996); *Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir. 1989)). Regardless, plaintiff fails to identify any credible evidence that she opposed an unlawful employment practice, much less that she suffered an adverse employment action because of it. Plaintiff argues that "[w]hen she did submit a written response to a negative performance evaluation, the negative actions against her ramped up, which she believes was in retaliation for her challenging the evaluation." (Pl.'s Opp'n (dkt. #32) 2.) However, the rebuttal to her evaluation does not even assert that she was being discriminated against on the basis of race or because of any other unlawful employment practice. Instead, plaintiff tries to conflate her tone deaf denial of being imperious and difficult to work with into an act of

free speech. (*See* June 2014 Evaluation (dkt. #23-8) 5; *see also* Compl. (dkt. #1) ¶¶ 451-52 (The Letter of Discipline "shows that Defendant[] Cyganek and some or all of the Defendants retaliated against Ms. King for simply exercising her right to defend herself against false accusations.").)

This is not to find that defendants' criticisms were justified or even appropriate, but rather than such workplace disagreements about what is or is not acceptable behavior do not give rise to a federal claim of retaliation. Therefore, the court will grant summary judgment on this claim as well.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #16) is GRANTED.

2) The clerk of court shall enter judgment for defendants and close the case.

Entered this 19th day of December, 2017.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge